UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUFFOLK COUNTY WATER          *     Case No. 17-CV-06980(NG)
 AUTHORITY,                   *
                              *
            Plaintiff,        *     Brooklyn, New York
                              *     December 10, 2019
     v.                       *
                              *
THE DOW CHEMICAL COMPANY,     *
  et al.,                     *
            Defendants.       *
                              *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          MATTHEW EDLING, ESQ.
                            KATHERINE JONES, ESQ.
                            STEPHANIE BIEL, ESQ.
                            Sher Edling LLP
                            100 Montgomery Street
                            Suite 1410
                            San Francisco, CA  94104

                            SCOTT ALLAN MARTIN, ESQ.
                            JEANETTE BAYOUMI, ESQ.
                            Hausfeld LLP
                            165 Broadway
                            Suite 2301
                            New York, NY  10006

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
APPEARANCES (Cont'd):

For New York American Water      FRANK SCHIRRIPA, ESQ.
Co., Inc, Defendant:             HILLARY NAPPI, ESQ.
                                 Hach Rose Schirripa &
                                 Cheverie, LLP
                                 112 Madison Avenue
                                 New York, NY  10016


For Dow Chemical Company,        KEVIN T. VanWART, ESQ.
 Defendant:                      NADER R. BOULOS, ESQ.
                                 Kirkland & Ellis LLP
                                 300 N. Lasalle
                                 Chicago, IL  60654

                                 JOEL ALAN BLANCHET, ESQ.
                                 Phillips Lytle LLP
                                 One Canalside
                                 125 Main Street
                                 Buffalo, NY  14203

For Ferro Corporation,           ROBB W. PATRYK, ESQ.
 Defendant:                      FARANAK TABATABAI, ESQ.
                                 Hughes Hubbard & Reed LLP
                                 One Battery Park Plaza
                                 New York, NY  10004


For Shell Oil Company,           DANIEL MARK KRAININ, ESQ.
 Defendant:                      Beveridge & Diamond, P.C.
                                 477 Madison Avenue
                                 New York, NY  10022


For Proctor & Gamble Company,    DAVID J. LENDER, ESQ.
 Defendant:                      JED P. WINER, ESQ.
                                 Weil, Gotshal & Manges,
                                  LLP
                                 767 Fifth Avenue
                                 New York, NY  10153


For Vulcan Materials Company,    FELICE B. GALANT, ESQ.
 Defendant:                      STEPHEN C. DILLARD, ESQ.
                                 Norton Rose Fullbright US
                                    LLP
                                 1301 McKinney
                                 Suite 5100
                                 Houston, TX  77010
```

3

1          (Proceedings commenced at 2:48 p.m.)

2          THE COURT:  We're having technical problems, so

3     we'll proceed without the recording.

4          There are some cases where I wouldn't dare do that

5     because the counsel wouldn't even agree on what was said at

6     the conference, but I know that you have been working

7     cooperatively.

8          So, again, have you come up with a proposal for

9     going forward?

10          And I understand we are on the record.  Just so the

11     record is complete, at the outset, I had everyone state their

12     appearances and those will be noted in the minute entry.

13          Mr. VanWart.

14          MR. VANWART:  Yes.  Your Honor, we've had productive

15     discussions.  We believe the next phase should proceed.  And

16     in a nutshell, as you know, we've received the fact sheets

17     together with documents.  We're still working through those.

18     And we might identify some issues, but we think we're going to

19     be able to resolve them.

20          But our proposal is that we try to resolve any

21     issues by January 21 and then report to the Court by January

22     21 if there are issues relating to the fact sheets.

23          At the same time, we want to go to the next --  the

24     next phase of discovery which is document collection.  And the

25     document collection would consist of party document requests.

4

1    So everybody would get a document request, respond to the

2    document request.  And at the same time, we would be serving

3    subpoenas on third parties who have relevant documents.

4            And we've identified some entities that are going to

5    be the initial wave of those requests.  We actually reviewed

6    them with representatives of the plaintiffs and they indicated

7    that they actually might join in some of those.  So we're all

8    kind of on the same page, but we'll be working toward those.

9            The other part of the discovery that we're proposing

10   would be a single interrogatory simply asking each plaintiff

11   that for each well that is at issue identify each known or

12   suspected cause of the dioxane, the source of the dioxane.

13   And so we're still having a discussion with plaintiffs about

14   the interrogatory, but that would be the basic roadmap.

15           And then we would provide the Court a status report

16   by January 21 indicating whether we've resolved issues

17   relating to the fact sheets and then what our progress has

18   been in meeting the deadline for serving -- or the target date

19   for serving subpoenas and document requests.

20           THE COURT:  And what is the target get?  Have you --

21           MR. VANWART:  January 21.  So we would be --

22           THE COURT:  So the discovery demands and the

23   subpoenas would issue around January --

24           MR. VANWART:  By.  Yes.  By.  Which ususally is that

25   date, but (indiscernible.)

1          THE COURT:  All right.  Anyone else want to be

2    heard?  And by the way, you're welcome to remain seated so

3    you're closer to the microphone.  Some of you project your

4    voices better than others.  But now that we have the recording

5    working, I'd like it to capture what you're saying.

6          MR. EDLING:  Okay.  Then I'll sit back down.

7          Perhaps not surprisingly because we have had

8    constructive conversations, everything that Mr. VanWart said

9    we agree with.  We discussed this morning what I'll categorize

10   as sort of truncated or focused interrogatories.

11         I think that we'll still go back.  I understand what

12   the defendants want.  We will confer with New York American

13   Water to determine a narrow set of interrogatories to the

14   extent we think that they're appropriate at this stage.

15         I do think all parties agree that sort of the

16   threshold, most important part of the case, at this stage is

17   the accumulation of relevant documents.

18         In a case like this it frequently, if not uniformly,

19   is important to make sure that the documents reflecting the

20   hydrogeology and potential sources are known to all parties as

21   it goes to various affirmative defenses and claims of the

22   plaintiffs.

23         So I like the aggressive target that Mr. VanWart

24   shared with Your Honor.  And I think based on our collective

25   experience, we would hope that by the end of the first quarter

1    we'd be able to tell Your Honor here's everything we got with

2    respect to that.

3            And obviously with some of the third parties -- or

4    I'll -- let me start that part of the sentence over -- we

5    can't control third parties as well as we can parties, but my

6    hope is is if we're working cooperatively, as we are, we'll

7    have a better success rate in terms of the accumulation of

8    those documents and can report back to Your Honor, which

9    perhaps is a transition as to, you know, I think or hope by

10   the end of the first quarter we'd be able to give Your Honor

11   sort of a next-stage suggestion.

12           And I do appreciate it's perhaps unusual for the

13   plaintiffs to say we don't, you know, we don't demand a trial

14   date at this stage and a full, robust pretrial schedule.

15       We've talked about that sort of at length and I do think

16   this is probably the best approach at this stage.  And then

17   we'd be in a position to sort of highlight for Your Honor what

18   the next step or steps are, especially given the number of

19   parties and the potential for, you know -- I don't know if

20   there'll be other parties, but not by my office.

21           THE COURT:  And if you're talking about doing this

22   as a phased approach and reporting to the Court, I take it

23   January 21st -- if that's the deadline for serving demands and

24   subpoenas -- you're not -- that's not the point at which you'd

25   be able to tell me whether you've accumulated most of the

1    documents that you want.  So you're talking about a second

2    date that would be at the next stage where you're ready to

3    start the next phase?

4                    MR. EDLING:  Yeah.  I was thinking -- and we

5    discussed a little bit -- that we should know -- and, you

6    know, to the extent there are any issues with respect to, you

7    know, motions to compel or whatever after the 21st, we'd be in

8    a position by the end of the first quarter, so the end of

9    March, to have -- if not resolved -- be able to identify for

10   Your Honor what that next stage would be.  And to the extent

11   there are any differences, flesh those out for you.

12                   THE COURT:  I did hear you say the first quarter,

13   but I wasn't sure whether you meant the first quarter of the

14   year or whether you were measuring from some other start date.

15                   MR. EDLING:  Yeah.  No.  I'm simply thinking that if

16   subpoenas go out on the 21st, there will be extensions given,

17   perhaps discussions about the breadth or not, and that by the

18   end of March we'd be in a position to have gathered those

19   documents or identified issues for you.

20                   THE COURT:  Now if the parties had conducted and

21   exchanged initial disclosures rather than the fact sheets, one

22   of the requirements for initial disclosures is for plaintiffs

23   to provide estimates of their damages.  Just looking quickly

24   over the fact sheet, I didn't see anything dealing

25   specifically with damages.

8

1          Do the plaintiffs have any sense of what the

2    remediation costs have been and will be going forward?  And

3    this is -- I'm not going to hold you to it, but I just --

4          MR. EDLING:  Sure.

5          THE COURT:  -- for a ballpark --

6          MR. EDLING:  Yeah.  No.  Sure.  We do.  Some of it

7    is frankly in the public domain.  There's a lot of reporting

8    on this.

9          But the upshot is there is treatment technology that

10   has known capital costs -- and I'm not trying to be opaque, it

11   is different depending upon the well -- but has known capital

12   costs associated with it for the advanced oxidation process

13   treatment, generally referred to as AOP, and then granulated,

14   activated carbon.  Those two in conjunction is the treatment

15   technology that's being employed.

16         Some of the plaintiffs in this case have begun and

17   even concluded pilot testing with that.  Others have budgeted

18   for it.  So you have traditionally in cases like this, kind of

19   the focus of the damages is generally on a per impacted well

20   basis.  So you have your capital costs, which I just sort of

21   identified for you.  You'll have your operating and

22   maintenance costs that will sort of extend out for the life of

23   that infrastructure.

24         And then commonly, and then absolutely, at the time

25   of trial, that would be discounted to present value.  And on

1        top of that, you'd have periodic costs.

2                I'm telling you what is going to go into it.  Not

3        because I don't want to tell you this is the number, but it is

4        different depending upon each well size.

5                For some of the plaintiffs in this case there are

6        documents that have already been produced that reflect those

7        reasonably anticipate costs.  There are also, frankly, more

8        than perhaps we would all like or can control estimates in the

9        press as to how much all of this is going to cost.

10               And I am sure that in the discovery that is coming

11       the type of estimates that are not just subject to expert

12       discovery are going to be shared, because all of these water

13       providers have to budget.  And the engineering that goes into

14       those budgets is obviously discoverable.  And so that, to the

15       extent it hasn't already been produced, will be.  That's a

16       mouthful.

17               THE COURT:  Well, now you've explained the

18       framework, but you haven't put any numbers on it.  Not even

19       per well, range or give an example of what a particular

20       plaintiff has budgeted for.

21               MR. EDLING:  Fair enough.

22               THE COURT:  I haven't followed the stories in the

23       press so I haven't seen those numbers.

24               MR. EDLING:  (Indiscernible) cost an O&M on a

25       traditional well for something like this is going to be

1    somewhere between 8 and 12 or 13 million dollars per well

2    depending upon the well size.  That is an estimate.  I am 100

3    percent sure that my colleagues to this side are going to vet

4    those numbers.

5           But in terms of, you know, a number or a category

6    that could sort of be part of that calculus, that's not an

7    unreasonable estimate.  There are documents that reflect this

8    on a per well basis that will be continued to be exchanged.

9           THE COURT:  And given the dozens of plaintiffs in

10   this case, what are we talking about in terms of the number of

11   wells?

12          MR. EDLING:  Fair.  For our clients, we are in the

13   neighborhood of between -- there are approximately 300 wells

14   at issue.

15          Now there are some wells that have exceedances above

16   what we all believe will be the maximum contaminant level.

17   And there are some that are below that but that require

18   ongoing monitoring.  And it is we believe the law the injury

19   is not defined by the MCL.

20          But from the perspective of the water providers,

21   they cannot provide water above the MCL.  So the costs that

22   they are doing and budgeting for anticipate that MCL and what

23   they would have to treat and the cost of treatment on a per

24   well basis.  That does not disaggregate those wells that are

25   above the MCL and those that are below.

1           So we're talking hundreds of wells at issue.

2     There's various press reports that put them in the hundreds

3     and perhaps as much as a billion dollars would be an estimated

4     treatment cost in Long Island.

5           And there already are now, you know, public debt

6     that's being obtained and costs that are being extended to the

7     rate payers to pay for that.

8           THE COURT:  The reason why I asked that question is

9     because I would certainly encourage the parties to try to see

10    whether some or all of the claims can be resolved through

11    settlement.  Has there been any discussion about mediation?

12          MR. VANWART:  The answer is no, Your Honor.  But

13    several of the questions that you just posed to Mr. Edling

14    were questions that I posed this morning.

15          MR. EDLING:  Yeah.

16          MR. VANWART:  And so --

17          THE COURT:  And you didn't get as much information

18    as I did?

19          MR. VANWART:  There was more skepticism in my

20    questions and the review of the answers.

21          But just a couple of things.  There are still a lot

22    of moving parts out there in the public including relating to

23    the MCL.  And what I said to Mr. Edling is you're throwing out

24    this number, 300 wells, that's inconsistent with what's in the

25    media.

1          A lot of the plaintiffs are telling their customers

2     that they're not all going to go to this treatment system if

3     they have to do it.  They're going to blend it.  They're going

4     to try to find a different water source.  They might increase

5     pumpage rates at other wells.  There are all sorts of things

6     that can happen that will affect whatever the ultimate damages

7     might be claimed in the case.

8          And then at the same time, the AOP figure that he

9     just quoted, the State has been quoting substantially lower

10    figures.  We don't know what the real numbers are.

11         But what I said to Mr. Edling is, I said, look, it's

12    going to be in everybody's interest that you just keep us

13    informed on a regular basis what the real number of wells are

14    potentially at issue.  That is something that's useful for

15    everybody to know and have that as they're looking at issues.

16         There's a lot of information that's needed I think

17    before you could have a meaningful discussion about

18    resolution.  And for us, the most important is how did the

19    dioxane get into these wells?  And that was not developed to

20    the extent that we had hoped it would be in the answers to the

21    fact sheets.

22         But there is a story for each well that will provide

23    important information about what is the actual source within

24    the capture zone of the well that led to that contamination.

25    And there would be other parties who would then have an

13

1    interest in the resolution.  And his own conduct might be at

2    issue in this proceeding.

3            We're just starting that phase now.  As we said,

4    collecting this baseline information is going to be important

5    over the next several months.

6            But we're nowhere near the point where we could talk

7    about a resolution, because all we know is we've made certain

8    things, but there's no information about how it actually ended

9    up in these wells and that's a story that's still to be

10   developed.

11           THE COURT:  Well, are you suggesting that the

12   defendants may want to bring in third-party defendants?

13           MR. VANWART:  I think that there will be an issue

14   about -- an evidentiary issue as to what the contribution is,

15   what the role was.  It's not clear yet what we actually need

16   to bring into a case.  That's something that we would be

17   considering.  But right now, we're just trying to pin down the

18   basic facts as to what is the actual pollution source, what

19   happened.

20           THE COURT:  So what would you like to accomplish

21   today at this proceeding?  I'm prepared to issue an order

22   directing that you report to the Court by January 21st.  Do

23   you want me to include in that order that document demands --

24   well, I guess it would be interrogatories, document demands,

25   and subpoenas all be issued and served by January 21st?

1          MR. VANWART:  You know, I mean, (indiscernible)

2    first wave, Your Honor, because as you get information, you

3    have more leads and there'll be some followup.  But I think

4    that's an appropriate -- it's a target date, but we will do

5    our best to meet it.  And then we'll be working with them on

6    some of the subpoenas that (indiscernible).

7          MR. DILLARD:  Your Honor, Mr. Dillard, on behalf of

8    Vulcan.

9          Perhaps I misunderstood something.  I thought the

10   interrogatories, as I understand it, would consist of one

11   interrogatory asking about the source of dioxane to the extent

12   plaintiff has that information.

13         THE COURT:  Well, I said interrogatories because I

14   thought the defendants might be serving interrogatories.

15         Unless you're satisfied with the fact sheets.

16         MR. VANWART:  And the reason -- just a little bit of

17   history -- and this is an issue that's been resolved -- there

18   was a privilege issue raised and we were satisfied with the

19   explanation that we got.  But we're trying to use the

20   interrogatory in part to replace what we expected to get from

21   the fact sheet.

22         It is simply you're the plaintiff, these are your

23   wells.  Tell us what you know either about the actual source

24   of the contamination, the dioxane, or your suspected source.

25   It's really straightforward and we don't think it's going to

1    take a lot of work on anybody's part.

2          THE COURT:  But when I used the term

3    interrogatories, I did not mean to suggest that they wouldn't

4    be focused, which is what the parties are talking about.  And

5    it may well be that it will be one interrogatory served by all

6    plaintiffs on each defendant.  But you've got more than one

7    defendant, so you've got plural interrogatories at that point.

8          MR. VANWART:  I would suggest that Mr. -- that we

9    have more discussions with the plaintiffs about the

10   interrogatories.  We don't want to open up kind of a can of

11   worms.  We want to get the documents.  And we think that the

12   interrogatories can be problematic.  Is it going to be worth

13   the effort?  So I suggest we have more discussions.

14         MR. EDLING:  Yeah.  I mean, Mr. VanWart and I and

15   Mr. Blanchet met this morning and discussed sort of the type

16   of discovery, including interrogatories, and I learned this

17   was what they wanted to do.

18             And I told them -- and it is our practice -- that we

19   have perhaps targeted interrogatories that we may serve by

20   January 21.  We may elect to defer those.  I don't really have

21   an interest -- and I'm certain that they don't have an

22   interest -- in sort of, you know, interrogatories for

23   interrogatories sake.

24             I do personally think that the best approach in

25   these types of cases is the document production, the document

1    gathering, third-party discovery.  We and they have an

2    interest in the chain of distribution and frequently, as Mr.

3    VanWart was alluding to, leads to sort of the key claims and

4    defenses.  And perhaps for them the inclusion or not of third

5    parties.

6           But it is certainly an evidentiary issue that comes

7    up in all of these cases where the theory of liability is at

8    the manufacturing level as opposed to sort of, you know, think

9    of your quintessential (indiscernible) allocation

10   responsibility.

11          THE COURT:  So what you had in mind was a joint

12   status report by January 21st?

13          MR. VANWART:  Yes, Your Honor.

14          MR. EDLING:  Yes.

15          THE COURT:  And then do you anticipate you'll be

16   requesting another conference or just including in the status

17   report a proposal for discovery in the next phase?

18          MR. EDLING:  I certainly hope it's the latter.  I

19   think we would request a status conference only if there are

20   issues that remain unresolved between the parties, which I

21   don't expect.

22          And to the extent Your Honor wishes, I mean, we

23   could set a status conference towards the end of the first

24   quarter if you wish.  Or we could, you know, propose something

25   to Your Honor in that update if you'd like.

1          THE COURT:  Well, if you think it's likely that the

2      parties will want another status conference, then I would

3      suggest it makes sense to pick a date now since there are so

4      many of you rather than trying to come up with a date several

5      months from now when people's calendars are full.

6          MR. VANWART:  I think, Your Honor, in terms of

7      dates, realistically, if we serve subpoenas say mid January,

8      sometime in January, you have the dialog and hear objections

9      and try to narrow and have discussions to focus, that's going

10     to take some time.

11          And then we finally get documents that we then use

12     and work with our expert and so forth.  So to me,

13     realistically, we're probably talking what March or April?

14          THE COURT:  Well, do we want it before or after the

15     holidays in early April?  We've got --

16          UNIDENTIFIED:  After.

17          UNIDENTIFIED:  After.

18          MR. VANWART:  Not to mislead Your Honor, you could

19     be seeing motions but from third parties once they get our

20     subpoenas and try to work them out.  But you might be hearing

21     from us anyway.

22          MR. EDLING:  Not our subpoenas.  Just theirs.

23          MR. VANWART:  Yeah.

24          MR. EDLING:  They'll love ours.

25          THE COURT:  All right.  So I'm looking at the week

18

1    of April 13th.  I don't have availability on that Monday or

2    Thursday morning.  But other than that, right now, it's fairly

3    open.  So do counsel have a preference?

4              UNIDENTIFIED:  No.

5              THE COURT:  For those of you coming from out of

6    town, do you prefer to be here on a Friday?

7              UNIDENTIFIED:  Friday morning's preferable.

8              THE COURT:  Friday morning?  10 o'clock.  The 17th?

9              UNIDENTIFIED:  That's fine.

10         (Pause.)

11             MR. DILLARD:  Your Honor, I'm sorry.  Again, what do

12   you have mid week?

13             THE COURT:  I said I have -- if you want it on

14   Wednesday, we could do it 10 o'clock Wednesday morning.

15             MR. DILLARD:  Anybody have a problem with that?

16             MR. EDLING:  No.  That works.  Thank you, Your

17   Honor.

18             THE COURT:  All right.  That's April 15th for anyone

19   who expects to be working madly to get your tax returns done.

20   I throw that out there.

21             MR. EDLING:  It will be a welcome respite, Your

22   Honor.

23             THE COURT:  And I would hope that by that time the

24   parties will have sufficient information so that you can at

25   least look ahead towards perhaps mediating these cases to see

1          whether or not they can be resolved or at least narrowed.

2                    Is there anything else that any of you would like to

3          discuss?

4                    MR. DILLARD:  Your Honor, just the observation that

5          there are these additional cases where the defendants have not

6          yet appeared.  I think our appearance date is like the 20th of

7          December.  And so --

8                    THE COURT:  But we're talking about the same

9          defendants so --

10                   MR. DILLARD:  That's correct.

11                   THE COURT:  -- their representatives are here now.

12                   MR. DILLARD:  Well, that's correct.  My point was

13         going to be talking about mediation after a certain date.  I

14         mean, I think there's going to be a delay in getting the fact

15         sheet responses because there's still these four or five cases

16         out there where the basic information has not been gathered

17         yet.

18                   THE COURT:  All right.  Well, I hope, as I said

19         earlier, that the parties can play catch-up in those cases.  I

20         assume that once you've -- it becomes easier the more OF these

21         fact sheets that you prepare -- which isn't to say that you're

22         -- that the plaintiffs don't have to dig up information about

23         -- well, you've got the information about each well.  There

24         are new plaintiffs?  Yeah.  The new plaintiffs.

25                   MR. EDLING:  Correct.

1          THE COURT:  So have they started gathering that

2    information even though the defendants haven't answered?

3          MR. EDLING:  Yes.  I'll say that for the newly filed

4    cases, other than but one are represented by my firm.  That

5    other case, I don't know.

6          THE COURT:  Mr. Schirripa, are you representing that

7    other plaintiff?

8          MR. SCHIRRIPA:  Yes, we represent (indiscernible).

9          MR. EDLING:  No.  No.  No.  The other plaintiff is

10   --

11         THE COURT:  No, the new --

12         MR. EDLING:  -- is Hicksville.  It's represented by

13   another plaintiffs' firm.  I can reach out to him and tell him

14   to get to work.

15         THE COURT:  And they didn't -- I'm disappointed that

16   they're not here.

17         MR. EDLING:  I don't know that they were -- actually

18   I'm fairly sure they filed after the order with respect to

19   this status conference as well as the fact sheet.  I think

20   they recently filed.

21         THE COURT:  I'm not suggesting that they're in

22   violation of any court order, but I just would have thought

23   that they would be aware of this status conference and that

24   they would have an interest in showing up.

25         MR. EDLING:  I will make sure to let Mr. Napoli

21

1    know.

2                    THE COURT:  All right.  All right.  Anything else?

3                    MR. EDLING:  Not from me, Your Honor.  Thank you.

4                    THE COURT:  All right.  Thank you all very much.

5    And keep up the collaborative work.  It's actually a pleasure

6    because most of the big cases that I have I can't remember the

7    last time I got out of a conference in half an hour.  More

8    like three hours.  All right.  Take care.

9         (Proceedings concluded at 3:14 p.m.)

10                   I, CHRISTINE FIORE, Certified Electronic Court

11   Reporter and Transcriber, certify that the foregoing is a

12   correct transcript from the official electronic sound

13   recording of the proceedings in the above-entitled matter.

14

15   *Christine Fiore*

16   _____        December 11, 2019

17        Christine Fiore, CERT

18

19

20

21

22

23

24